IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

  v.

WALTER THARRINGTON,

    Defendant.

CRIMINAL ACTION
NO. 24-310

## OPINION

**Slomsky, J.**                 **March 28, 2025**

### TABLE OF CONTENTS

I.  **INTRODUCTION** ........................................................................................... 1

II.  **FINDINGS OF FACT** ................................................................................... 3

 A. Factual Background .................................................................................. 3

  1. Summary of Interrogation Video .................................................... 4

  2. Transcript of Interrogation Audio ................................................... 5

   a. Pre-Miranda Statements ........................................................ 6

   b. Post-Miranda Statements ....................................................... 10

   c. Booking Statements ................................................................ 14

 B. Procedural Background ............................................................................ 16

III.  **CONCLUSIONS OF LAW** ......................................................................... 16

 A. Defendant's Pre-Miranda Statements Will Be Suppressed ..................... 19

 B. Defendant's Post-Miranda Statements Will Be Suppressed ................... 22

 C. Defendant's Booking Statements Will Be Suppressed In Part ................ 25

IV.  **CONCLUSION** ........................................................................................... 28

## I.    INTRODUCTION

On August 28, 2024, a grand jury in the United States District Court for the Eastern District of Pennsylvania returned a four-count indictment charging Defendant Walter Tharrington ("Defendant" or "Tharrington") with the following: (1) sex trafficking by force, fraud, coercion, and of a minor, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c) and 1594(a);[1] (2) manufacturing child pornography, in violation of 18 U.S.C. § 2251(a);[2] (3) advertising child

---

[1]    18 U.S.C. § 1591 provides in pertinent part as follows:

(a) Whoever knowingly—
(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;
***
(b) The punishment for an offense under subsection (a) is—
***
(2) if . . . the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

18 U.S.C. §§ 1591(a)(1), (b)(2), (c).

[2]    18 US.C. § 2251(a) provides:

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in

pornography, in violation of 18 U.S.C. § 2251(d)(1)(A);[3] and (4) possessing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).[4]  (See Doc. No. 1.)  These charges stem from Defendant's alleged conduct with a minor ("Minor 1"), including purportedly taking explicit pictures and videos of Minor 1 at Defendant's residence and posting the pictures and videos on a commercial sex website as advertisements.  (See id.; Doc. No. 27 at 3.)

---

or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

[3]    18 U.S.C. § 2251(d)(1)(A) provides:

(d)
    (1) Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering—
    (A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; . . .

[4]    18 U.S.C. § 2252(a)(4)(B) provides:

(a) Any person who—
***
    (4) either—
***
    (B) knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—
        (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
        (ii) such visual depiction is of such conduct;
    shall be punished as provided in subsection (b) of this section.

On September 26, 2024, agents from the Federal Bureau of Investigation ("FBI") arrested Defendant on these charges. (Doc. No. 28 at 1.) Following his arrest, the FBI transported Defendant to the Philadelphia FBI field office. (Id. at 3.) There, he was placed in an interrogation room where he remained for approximately one hour. (Id.) While in the interrogation room, Defendant claims that the FBI agents purposely delayed reading him his Miranda rights for the first thirty minutes while they prodded him to make uncounseled statements. (Doc. No. 25 at 3.) After Defendant "succumbed to the pressure of this custodial encounter and made certain statements," the FBI agents then gave him the Miranda warnings and "continued to interrogate and elicit conversation from [him] for another half hour." (Id.) On September 24, 2025, Defendant filed a Motion to Suppress Custodial Statements. (See id.) For reasons that follow, Defendant's Motion to Suppress Custodial Statements (Doc. No. 25) will be granted in part and denied in part.

## II.    FINDINGS OF FACT

### A.    Factual Background

On February 7, 2024, the FBI obtained and executed a search warrant for Defendant's residence and seized two cellphones. (See Doc. No. 27-2.) Months later, on September 26, 2024, the FBI arrested Defendant. (Doc. No. 25 at 3.) The details of his arrest are not known to the Court but, sometime after being arrested, Defendant was transported to the FBI field office in Philadelphia. (Doc. No. 28 at 3.) There is no record of Defendant being read his Miranda rights prior to being taken to the field office. At the field office, the FBI agents assigned to Defendant's case, Agent 1 and Agent 2, placed Defendant in an interrogation room.[5] (See id.) At some point prior to Defendant entering the interrogation room, he had been informed of the charges pending

---

[5]    The Court will refer to the FBI Agents involved in this case as Agent 1 and Agent 2, respectively.

against him.  Defendant remained in the interrogation room from 6:46 p.m. until 7:49 p.m.  (Id.)
There is video and audio recording of the hour that Defendant was in the interrogation room,
which the Court has watched in its entirety.  (See Doc. No. 25 at 4.)  The Court will first
summarize the events on the video before including portions of a stipulated transcript of the
audio.[6]

### 1.  Summary of Interrogation Video

The video reveals that for the first thirty-eight (38) minutes that he was in the
interrogation room, Defendant remained uncuffed and upright in a chair at a small table.  During
this time, the door to the interrogation room was open while Agent 1 and another FBI agent went
in and out of the room.  (See Doc. No. 47 at 3 n.2.)  At the beginning of the video, Defendant sat
at the table doing something on his phone until Agent 1 told Defendant that he could not be on
his phone at this time, took the phone from Defendant, and placed it across the table from him.
The phone remained across the table from Defendant for several minutes until, approximately
two and a half minutes into the video, Defendant grabbed the phone and slammed it onto the
floor.

Thereafter, Agent 1 sat with Defendant for most of the time he remained in the
interrogation room.  According to Agent 1, they had to wait for Agent 2 to finish certain
paperwork relating to Defendant before they could read Defendant his Miranda rights and
proceed with talking to Defendant about the charges against him.  Defendant and Agent 1 sat
together in the interrogation room, sometimes in silence and sometimes talking (as detailed in the

---

[6]  The video of the interrogation is in the record as Exhibit "A" to Defendant's Motion to
Suppress Custodial Statements (Doc. No. 25), as Exhibit "A" to the Government's Response
in Opposition (Doc. No. 28), and as Defense Exhibit D020 marked at the hearing on the
Motion held on March 13, 2025.  The transcript of the audio portion of the video is in the
record as Exhibit "B" to Defendant's Supplemental Memorandum in support of his Motion to
Suppress.  (See Doc. No. 47-2.)

below transcript), before Agent 2 came into the interrogation room with the paperwork approximately twenty-five (25) minutes into the video. At this time, Agent 2 closed the door to the interrogation room and, approximately thirty-three (33) minutes into the video, read Defendant his <u>Miranda</u> rights from the advice of rights form.

As will be reflected in the below transcript, Agent 2 then gave Defendant the advice of rights form and asked Defendant to read it out loud before signing the form to acknowledge that he understood his rights and agreed to talk to the agents without a lawyer if he wished. Defendant read the form but refused to sign it, indicating he was not willing to talk to the agents without counsel present. The agents then told Defendant that they could not talk to him if he did not sign the form, and that, if they were not going to talk, it would be time to transfer Defendant to the Federal Bureau of Prisons ("BOP") for the night. Defendant agreed, and Agent 2 left the interrogation room to begin the BOP intake paperwork. When Agent 2 left, now approximately thirty-eight (38) minutes into the video, Agent 1 handcuffed Defendant to the table. Defendant remained handcuffed to the table for the remainder of the video.

While they waited for Agent 2 to complete the BOP paperwork, Defendant and Agent 1 again sat together in the interrogation room. Their conversation during this time will be reflected in the below transcript. Approximately fifty-five (55) minutes into the video, Agent 2 returned to the interrogation room with paperwork and sat at the table asking Defendant various questions from the paperwork as he worked on completing it. These questions will also be reflected in the below transcript.

### 2. Transcript of Interrogation Audio

Below are the relevant portions of the stipulated transcript of the audio from Defendant's hour in the FBI interrogation room. (<u>See</u> Doc. No. 47-2.) For the purpose of this Opinion, the transcript will be broken into three sections: (1) the statements made before Defendant was read

his <u>Miranda</u> rights (the "pre-<u>Miranda</u> statements"); (2) the statements made after Defendant was

read his <u>Miranda</u> rights (the "post-<u>Miranda</u> statements"); and (3) the statements Defendant made

in response to Agent 2's booking questions (the "booking statements").

### a.    Pre-**Miranda** Statements

The following is a stipulated transcript of the statements made before Defendant received

the <u>Miranda</u> warnings:

<u>Agent 1</u>: Hey, can't use that now [referring to Defendant using his phone]. Okay? Just gonna leave that there. I'm just gonna wait for [Agent 2] to come down . . .

\*\*\*

[Tharrington throws phone.]

<u>Agent 1</u>: That was not very smart. Still works.

<u>Tharrington</u>: Don't matter if it work or not. I can't call my fucking mama.

<u>Agent 1</u>: I told you. We're gonna call your mom. I already explained all that to you.

\*\*\* [Defendant expresses his disbelief and anger over the charges.]

<u>Agent 1</u>: [Agent 2] is upstairs. He's the case agent. We're gonna talk about everything.

<u>Tharrington</u>: I see you around all the time. You see me all the time downtown. I see you around here all the time, bro. You know I'm not a bad guy. You seen me a million and one times. You, you remember this [face]? cause one thing about me, I talk to everybody. I see I seen you a million and one time, never knew you was a FBI agent. But I see you a million and one times and talk to you downtown at Center City, at City Hall plenty of times . . .

\*\*\*

<u>Agent 1</u>: Alright, look, we're we're gonna go through this the same way. You've already told me you've been arrested how many times? you said you've been…

<u>Tharrington</u>: I ain't never been. Like I said, I've never been here.

<u>Agent 1</u>: Not FBI. I know, but it's the same process.

6

<u>Tharrington</u>: It's not. . . . It's not . . .

\*\*\*

<u>Agent 1</u>: So, so listen, let's, let's do…

<u>Tharrington</u>: This shit is bullshit bro.

<u>Agent 1</u>: Let's do the process. [C]ause what we're gonna do is [Agent 2] and I are going to, we're gonna explain everything on your charges. The case we're gonna explain like how things are gonna work. You already know before we do any of that, we gotta talk to you. We gotta, we gotta start with your rights. That's the first step. And I just need to wait for my partner to get down here. So we can start that. And then we're gonna go through this. I'm gonna tell you this right now before we start that. The best way to help yourself, just be straight up. If you don't want to tell me something, you wanna tell [Agent 2] something, just say that. Okay? But I need to hear, I want to hear your side of the story. I can't hear that until we kind of do this the right way. Okay?

<u>Tharrington</u>: This is about to be the fucking dumbest shit in the world. Because like I told people from the get go, I don't even understand what the fuck is going on.

<u>Agent 1</u>: So let's get through it. Alright, let's get…

\*\*\* [Defendant continues to express confusion and disbelief over the charges.]

<u>Agent 1</u>: Listen, I, I gotta, I can't talk to you until I do this the right way.

<u>Tharrington</u>: I understand. Mm-hmm.

<u>Agent 1</u>: Just gimme a minute. Alright, gimme a minute. And I'm asking you, you've been a gentleman the entire time, please…

<u>Tharrington</u>: I understand.

 <u>Agent 1</u>: No more of that stuff. Okay? I know you're upset. I know there's a lot of stuff going on, but just calm it down, okay?

\*\*\*

[No talking for approximately three and a half minutes.]

\*\*\*

<u>Agent 1</u>: Where's your mom gonna be tonight? Corlies?

Tharrington: That's where she lives.

Agent 1: Alright.

[No talking for approximately a minute and a half.]

Tharrington: I want to ask you a question.

Agent 1: Sure.

Tharrington: For somebody to get raped. Don't y'all do a swab test?

Agent 1: It all depends honestly. Depends like how long it's been. Lots of factors.

Tharrington: Okay.

Agent 1: Why?

***

[Defendant and Agent 1 discuss Defendant's charges and their discuss the legal definitions. Defendant continues to express his confusion about being charged with these crimes.]

***

Agent 1: I, I'd prefer we talk about this after I read you your rights. I mean, if you want to keep asking questions, I can't like you can.

***

Agent 1: [They're] still print[ing] out your stuff over there. We have to fill out the Bureau of Prisons form. So you're gonna go to the Bureau of Prisons, which is across the street tonight. Tomorrow morning the Marshals are gonna pick you up, bring you back over. You'll see us over there . . .

***

[Agent 2 enters the interrogation room, sets a pile of paperwork on the table, and then leaves again.]

Agent 1: [hands Defendant a piece of paper] That's your arrest warrant. Um, we've also got child pornography charges on there. [a period of silence as Defendant looks through the papers] The rest of that stuff's just for, that's not your charges. This is, that's just like your basic information. This is, the charges are alright here.

8

<u>Tharrington</u>: [unintelligible]

<u>Agent 1</u>: So the first count is the sex trafficking. Sex trafficking of a minor. And they use language force fraud, coercion. So it's, I that's any of those Manufacture child pornography, meaning you made it. Advertising, which means you posted it. Possession, which means it was on your devices. Aiding and abetting means you worked with somebody, which is why you have an opportunity to talk with us today. Because we'd like to know about that. That's an opportunity for you to help yourself. Again, my partner's upstairs. Getting that form before we can start . . .

\*\*\*

[Defendant and Agent 1 sit in silence for approximately two and a half minutes before Agent 2 re-enters the interrogation room and closes the door behind him.]

<u>Agent 1</u>: Walter, you good, man?

<u>Tharrington</u>: I'm fine.

<u>Agent 1</u>: Good.

<u>Agent 2</u>: Alright, man. Alright, Walter, um, you got preference and name? Walter? Walt?

<u>Tharrington</u>: Don't matter. whatever y'all got on paper?

<u>Agent 2</u>: Alright, I'll, I'll call you Walter, alright?

<u>Tharrington</u>: Mm-hmm.

<u>Agent 2</u>: In reference to yourself. Okay. Alright. Um, before anything before we get into anything, um, I gotta read you your advice of rights, alright?

<u>Tharrington</u>: Mm-hmm.

<u>Agent 2</u>: Alright. So I'm special agent [Agent 2]. That's my partner, coworker, uh, special agent [Agent 1]. Okay. So before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. You understand that?

9

<u>Tharrington</u>: Mm-hmm.

(<u>Id.</u> at 2-11.)

### b.    Post-<u>Miranda</u> Statements

The following is a stipulated transcript of the statements made after Defendant received

the <u>Miranda</u> warnings:

<u>Agent 2</u>: Alright. Alright. So, sir. Okay, take this all in. [Agent 2 hands Defendant the advice of rights form.]  You, you can read this back to me, right? This is basically you consenting to speaking with us without a lawyer.

<u>Tharrington</u>: I never said I would do that.

<u>Agent 2</u>: Okay, well if you, if you…

<u>Tharrington</u>: I don't even know what I'm here for. I know what I'm here for.

<u>Agent 1</u>: Okay.

<u>Tharrington</u>: But at the end of the day y'all keep talking. That's like he just said it's video. You just…

<u>Agent 1</u>: Walter…

<u>Tharrington</u>: [reading the advice of rights form] To ask you any question you have, you have the right to remain silent. Oh, this is just consenting that I got these rights.

<u>Agent 1</u>: Yeah.

<u>Agent 2</u>: Yes. Basically.

<u>Agent 1</u>: Absolutely.

<u>Agent 2</u>: Mm-hmm. So basically, can you read this back to me before you sign?

<u>Tharrington</u>: [reading the advice of rights form] I have read the statement and my rights and I understand my rights are, but this time I am willing to answer questions without a lawyer present. [finishes reading the advice of rights form] I'm not.

<u>Agent 2</u>: Hmm?

Tharrington: I'm not. cause I don't even know what's going on. So I don't know if I need a lawyer or not. So I'm not gonna place myself.

Agent 1: It's entirely up to you.

Agent 2: Yep.

Agent 1: But we, we can't, we can't talk to you about the case at all in any way, shape or form without this.

Tharrington: Okay.

Agent 1: So that, that's entirely up to you. Okay?

Tharrington: Alright.

Agent 1: That it? You good?

Tharrington: Yeah.

Agent 1: We we'll take you across the street now.

Tharrington: Yeah, that's cool

***

[Agent 2 begins filling out a form. Agent 1 tells Agent 2 he needs to fill out the Marshal's intake form to take Defendant to BOP. Agent 2 says that the intake form is upstairs, and leaves to go get it. When Agent 2 leaves, Agent 1 handcuffs Defendant to the table. Agent 1 remains in the interrogation room with Defendant while he is handcuffed to the table.]

*** [Defendant continues to express disbelief and denial over his charges.]

Agent 1: . . . I'm gonna play it straight with you, Walter.

Tharrington: I'm gonna tell you what, how…

Agent 1: We don't, we don't pick you up on a whim.

Tharrington: Bro.

Agent 1: This is like, this is like over a year. Yeah. Now look…

Tharrington: Mm-hmm.

11

<u>Agent 1</u>: Here's the deal. Like honestly, I, I don't want you to talk to me because you said you don't want to talk.

<u>Tharrington</u>: Say what you want to say bro. Say what you want.

<u>Agent 1</u>: I'm just telling you, I like, I, I just want you to recognize that you are here because we have conducted a very long, very thorough case.

<u>Tharrington</u>: Mm-hmm.

<u>Agent 1</u>: The search warrant from your house…

<u>Tharrington</u>: Mm-hmm. I know.

<u>Agent 1</u>: …gave us every facet of proof in the case that we needed.

<u>Tharrington</u>: Okay.

<u>Agent 1</u>: So you're gonna have an opportunity at some point to help us out because you're not the only person that was involved in this and you know how that works. The first one in the door wins.

<u>Tharrington</u>: I don't know, bro. Like I said, I don't know. Me, personally? I don't know what people around me do. I don't know. I tell people, keep me outta y'all shit. That's it. That's all. I'm pretty sure I know exactly who you talk about. I know what you talk about.

<u>Agent 1</u>: Listen, I…

<u>Tharrington</u>: But at the end of the day, I don't know.

<u>Agent 1</u>: Walter.

<u>Tharrington</u>: Because people talk to me, they do, Hey, fuck, like this shit is burning up.

<u>Agent 1</u>: I'm gonna tell you like, do, do you know what I did last week? Last week I went into a federal prison. I talked to a guy that was sitting where you are right now. He was sitting where you are right now, 12 years ago, and he did the same thing that you're doing right now. And I went, I talked to him in federal prison because it took 12 years. But at that point in time, he thought it was time that he could come in and he could help us out because he now knows he has 30 years. And I'm telling you right now, that information was useless at that point. So you don't have a long window. Go find yourself an attorney, get yourself an appointed attorney, hire one, come back. But I hear you. I'm just saying having investigated this case. Like it don't track, bro. It don't. I like, I I'm just playing

12

straight with you. Like I'm not, I'm not throwing anything on you. I'm not throwing any shade your way. I'm telling you.

Tharrington: Basically what y'all is doing, bro, what's been happening since day one. That's what been happening since day one.

Agent 1: I mean, Walter, you're in the pictures with the minor.

Tharrington: That's what you believe. I'm not saying…

Agent 1: It's not believe it's, it's like it's there. It's on your phone, man. We took it from your house.

Tharrington: Okay.

Agent 1: Like, that's, that's all I'm saying. But…

Tharrington: Pictures with a minor?

Agent 1: Listen, listen.

Tharrington: Pictures went a minor?

Agent 1: Listen, listen. Don't

Tharrington: Picture.

Agent 1: Listen.

Tharrington: Like face, face.

Agent 1: I'm telling, I'm telling you like… [slides the advice of rights form in front of Tharrington.]

Tharrington: Okay. [Tharrington still does not sign the form]

Agent 1: we're we, we're not talking. I'm telling you this so you can go over there, think it through. I, I got no reason to lie to you. You're here because…

Tharrington: I'm trying to think who the minor is. I'm still trying to figure out, I never got a face or nothing, bro, since this case started, bro. I don't know who the face is, bro.

Agent 1: Unfortunately we can't talk about it right now.

***

13

<u>Agent 1</u>: . . . I can't talk to you about your case right now because you don't want to talk and that's cool. I'm telling you. Go over there. Think about it. Talk to your lawyer when you get your lawyer. You don't have a long window. Okay? That's it. You got a short window. I'd think about it really hard too because they are already in custody. Pretty sure they're gonna give you up.

\*\*\*

[Agent 1 lets Defendant call his mother and both Agent 1 and Defendant sit in the interrogation room, talking to Defendant's mother and Defendant's girlfriend on the phone. The phone call lasts approximately six (6) minutes.]

(<u>Id.</u> at 11-23.)

###    c.    Booking Statements

The following is a stipulated transcript of the statements Defendant made in response to

Agent 2's booking questions:

[After Defendant and Agent 1 hang up their phone call with Defendant's mother, Agent 2 re-enters the interrogation room with another form and proceeds to ask Defendant questions from the form.]

<u>Agent 2</u>: . . . And that your social on top, uh, go.

<u>Tharrington</u>: [tells Agent 2 his social security number]

<u>Agent 2</u>: Got a middle initial, middle name? Middle name?

<u>Tharrington</u>: D.

\*\*\*

<u>Agent 2</u>: Okay. Um, your mom country births [Pennsylvania?] or I mean, uh, US? Alright. Father's too?

<u>Tharrington</u>: Yes.

<u>Agent 2</u>: Okay. You wasn't in a jail or medical facility recently?

<u>Tharrington</u>: uh-uh.

\*\*\*

<u>Agent 2</u>: Alright. You got any aliases?

14

Tharrington: They on the paper. Black and roadblock.

\*\*\*

Tharrington: Yeah, one of 'em. My uh, business name.

Agent 2: What's that? Roadblock?

Tharrington: Mm-hmm.

Agent 2: What kind of business?

Tharrington: I do, uh, music and engineering.

Agent 2: Okay.

\*\*\*

Agent 2: Your emergency contact your mom? Is it Tar Taria?

Tharrington: T-A-R-I-A. Same last name.

\*\*\*

Agent 2: What's her phone number?

Tharrington: 215.

Agent 2: Yep.

Agent 1: No, your mom.

Tharrington: Yeah. 897.

Agent 1: No.

Tharrington: 2116. Oh 267.

Agent 1: 267.

Tharrington: 897. I'm sorry, my bad.

Agent 2: You're good.

Tharrington: 267-897-2116.

15

\*\*\*

(Id. at 23-26.)

### B.    Procedural Background

As mentioned above, on August 28, 2024, a grand jury returned a four-count indictment charging Defendant with sex trafficking of a minor as well as manufacturing, advertising, and possessing child pornography.  (See Doc. No. 1.)  On September 27, 2024, an arrest warrant issued for Defendant and, on the same day, Defendant was arrested by the FBI.  On October 1, 2024, Defendant pled not guilty to the charges on all counts.

On February 24, 2025, Defendant filed the instant Motion to Suppress Custodial Statements.  (Doc. No. 25.)  On March 3, 2025, the Government filed a Response in Opposition to Defendant's Motion.  (Doc. No. 28.)  On March 13, 2024, the Court held a hearing on the Motion, where counsel for the parties agreed that the Court should make its decision on this Motion based on the video and audio recording of Defendant's time in the FBI field office interrogation room.  (See Doc. No. 44 at 4:11-25.)  On March 19, 2025, Defendant filed a Supplemental Memorandum in support of his Motion to Suppress Custodial Statements as well as a stipulated transcript of the video and audio recording of the interrogation video.  (Doc. Nos. 47, 47-1.)  Defendant's Motion to Suppress Custodial Statements (Doc. No. 25) is now ripe for disposition.

## III.    CONCLUSIONS OF LAW

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  In Miranda v. Arizona, the United States Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the [Fifth

Amendment] privilege against self-incrimination is jeopardized." 384 U.S. 436, 478 (1966). To remedy this, Miranda requires that persons subject to custodial interrogation be provided the following warnings before the interrogation begins: "[h]e must be warned . . . that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 479. These warnings are intended to protect against compelled self-incrimination by acknowledging "the compulsion inherent in custodial surroundings." Id. at 458.

The Third Circuit Court of Appeals applies a two-part test in determining whether a person has been subject to custodial interrogation: "[f]irst, [a court] must determine whether the suspect was in 'custody.' If the suspect was in 'custody,' the court then must decide whether the police interrogated him." United States v. Mesa, 638 F.2d 582, 585 (3d Cir. 1980) (citation omitted). To determine if a suspect was in custody, a court must ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). Moreover, in Rhode Island v. Innis, the Supreme Court defined "interrogation," as "either express questioning or its functional equivalent . . . [meaning] words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300-01 (1980).

Statements obtained during a custodial interrogation in violation of a person's Miranda rights must be suppressed unless that person "knowingly and intelligently waive[s] these rights

and agree[s] to answer questions or make a statement."  See Miranda, 384 U.S. at 479.  This

exclusionary rule has been summarized by the Supreme Court as follows:

> The Miranda exclusionary rule . . . serves the Fifth Amendment and sweeps more
> broadly than the Fifth Amendment itself . . . The Fifth Amendment prohibits use
> by the prosecution in its case in chief only of compelled testimony. Failure to
> administer Miranda warnings creates a presumption of compulsion. Consequently,
> unwarned statements that are otherwise voluntary within the meaning of the Fifth
> Amendment must nevertheless be excluded from evidence under Miranda . . . But
> the Miranda presumption, though irrebuttable for purposes of the prosecution's
> case in chief, does not require that the statements and their fruits be discarded as
> inherently tainted. Despite the fact that patently voluntary statements taken in
> violation of Miranda must be excluded from the prosecution's case, the
> presumption of coercion does not bar their use for impeachment purposes on
> cross-examination.

Oregon v. Elstad, 470 U.S. 298, 306-07 (1985) (emphasis in original).  Put differently, statements

taken in violation of Miranda cannot be used in the prosecution's case in chief but can be used by

the prosecution for impeachment purposes on cross-examination.  See id.  Statements made,

however, "where one, not under stress of interrogation, simply volunteers a statement which

perchance turns out to be inculpatory," do not run afoul of Miranda.  United States v. Fioravanti,

412 F.2d 407, 413-14 (3d Cir. 1969); see also Miranda, 384 U.S. at 478 ("Volunteered statements

of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our

holding today.")

Here, the Government concedes that Defendant was in custody at the time he made the

statements at issue.  (See Doc. No. 28 at 5 ("The evidence, including the video recording, shows

that the defendant was in lawful custody . . .").)  As such, the only issue is whether Defendant

was subject to interrogation while in custody.  Defendant, arguing that he was subject to the

functional equivalent of interrogation, moves to suppress both his pre-Miranda statements and

post-Miranda statements.  The Court will address Defendant's pre-Miranda and post-Miranda

statements, as well as Defendant's statements made in response to Agent 2's booking questions, in turn.

### A.    Defendant's Pre-<u>Miranda</u> Statements Will Be Suppressed

Because Defendant was subject to the functional equivalent of interrogation, his pre-<u>Miranda</u> statements will be suppressed.  As mentioned above, an individual is interrogated for purpose of <u>Miranda</u> when they are subject to either express questioning by law enforcement officers or its functional equivalent, <u>i.e.</u> "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. at 300-01.  "The latter [functional equivalent] portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Id.</u> at 301.

When determining whether a defendant has been subject to the functional equivalent of interrogation, courts consider a number of factors, including:  (1) whether the officers "intentionally created circumstances likely to elicit a statement" from the defendant and whether the defendant "would have felt compelled to respond to the arresting officer's statement" (<u>United States v. Benton</u>, 996 F.2d 642, 644 (3d Cir. 1993)); (2) whether the officers told the defendant that his cooperation would result in lenient treatment (<u>Charette v. State of Minnesota</u>, 980 N.W.2d 310, 319 (Minn. 2022)) or asked the defendant to be forthcoming (<u>United States v. Bernard</u>, 927 F.3d 799, 806-07 (4th Cir. 2019)); and (3) whether the defendant appeared emotionally distressed or "peculiarly susceptible" to certain tactics (<u>see</u> Innis, 446 U.S. at 302-03).

Here, considering these factors, FBI Special Agents 1 and 2 engaged in words and actions in the interrogation room that they should have known were reasonably likely to elicit an incriminating response from Defendant.    First, Agents  1  and  2  intentionally created

circumstances likely to elicit a statement from Defendant. See Benton, 996 F.2d at 644. Agent 1 placed Defendant in an interrogation room and sat there chatting with him for thirty minutes before Defendant was given Miranda warnings. At some point prior to the start of the interrogation video, Defendant had been informed of the charges pending against him and, as the transcript reflects, he repeatedly expressed his anger and disbelief at being charged with such crimes. Moreover, while Agent 1 sat in the interrogation room with Defendant, he openly discussed the pending charges with Defendant. They went over Defendant's arrest warrant together and even talked about the legal definitions for some of the charges. Given the sensitive nature of the charges pending against Defendant, Agent 1 should have known that actions such as discussing the pending charges with Defendant and presenting him with the arrest warrant were likely to prompt Defendant into responding.

Second, toward the beginning of the interrogation video, Agent 1 told Defendant to be forthcoming, explaining that the best way to help himself would be if Defendant cooperated with the FBI's questioning. See Charette, 980 N.W.2d at 319. Specifically, Agent 1 told Defendant that "[t]he best way to help yourself, just be straight up . . . I need to hear, I want to hear your side of the story." (Doc. No. 47-2 at 4:6-9.) As noted above, Agent 1 also should have known that encouraging Defendant to be forthcoming and cooperate would prompt Defendant into making incriminating statements.

Finally, Agent 1 knew Defendant was in a state of emotional distress and prone to angry outbursts. See Innis, 446 U.S. at 302-03. For example, approximately two and a half minutes into the interrogation video, Defendant slammed his phone into the ground. (Doc. No. 47-2 at 2:12.) He then communicated to Agent 1 that he had done so because he was stressed out over the pending charges. (See id. at 2:20-35.) And Agent 1 acknowledged that he knew Defendant

was upset, saying "I know you're upset. I know there's a lot of stuff going on, but just calm it down, okay?" (Id. at 5:10-11.) Because Agent 1 knew Defendant was emotionally distressed, he should have known that Defendant would be "peculiarly susceptible" to the tactic of mentioning to Defendant the pending charges that Agent 1 knew Defendant was upset about. This was a way of getting Defendant to speak. See Innis, 446 U.S. at 302-03.

Thus, the words and actions of Agent 1 in the interrogation room prior to Defendant being given the Miranda warnings were the functional equivalent of interrogation. This conclusion is underscored by Defendant's representations that he and Agent 1 knew each other to some extent. Defendant told Agent 1 at the beginning of the interrogation that:

> I see you around all the time. You see me all the time downtown. I see you around here all the time, bro. You know I'm not a bad guy. You seen me a million and one times. You, you remember this [face]? cause one thing about me, I talk to everybody. I see I seen you a million and one time, never knew you was a FBI agent. But I see you a million and one times and talk to you downtown at Center City, at City Hall plenty of times . . .

(Id. at 3:9-14 (emphasis added).) As reflected in this statement, Defendant and Agent 1 were familiar with each other because they frequented the same neighborhood. Defendant even suggested that Agent 1 should know that he is a talker since, as Defendant admits, "one thing about me, I talk to everybody," including to Agent 1 when Defendant saw him "downtown." (Id. at 3:11-12.) With this knowledge that Defendant is a talker, Agent 1 should have known that confronting Defendant with his arrest warrant and going through the list of charges pending against him was likely to compel Defendant into responding to Agent 1's statements about the pending charges. See Benton, 996 F.2d at 644.

Furthermore, while Agent 1 repeatedly tells Defendant that he cannot talk to him until Defendant has been given the Miranda warnings, this admonition is not enough to overcome Agent 1's other words and actions that induced Defendant into making certain statements. If

Agent 1 did not wish to engage with Defendant until he had been given the <u>Miranda</u> warnings, he could have handcuffed Defendant to the wall or the table in the interrogation room and left him there alone until he was given the warnings.

Accordingly, because Defendant was subject to the functional equivalent of interrogation while in the FBI's custody, his pre-<u>Miranda</u> statements will be suppressed. These statements, however, may be used by the Government for impeachment purposes on the cross-examination of Defendant should he testify at trial. <u>See</u> <u>Elstad</u>, 470 U.S. at 306-07.

**B.    Defendant's Post-<u>Miranda</u> Statements Will Be Suppressed**

Next, because the FBI agents interrogating Defendant deliberately engaged in a two-step "question first, warn later" strategy, Defendant's post-<u>Miranda</u> statements will be suppressed as well. In <u>Missouri v. Seibert</u>, the Supreme Court in a plurality opinion prohibited the law enforcement "question first, warn later" tactic in which officers deliberately delayed giving <u>Miranda</u> warnings to a suspect until after they had elicited a confession from the suspect. 542 U.S. 600, 604, 617 (2004). Under this tactic, only once the suspect had confessed would the officers give the <u>Miranda</u> warnings to the suspect, before asking the suspect the same questions as before to elicit a post-<u>Miranda</u> confession. <u>See</u> <u>id.</u> at 604. While the <u>Seibert</u> decision was decided by a plurality of the Supreme Court, the Third Circuit Court of Appeals has held that in such a situation where "the deliberate two-step strategy has been used, post[-]warning statements that are related to the substance of pre[-]warning statements must be excluded unless curative measures are taken before the post[-]warning statement is made." <u>United States v. Naranjo</u>, 426 F.3d 221, 232 (3d Cir. 2005) (quoting <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring)).

"Such '[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the <u>Miranda</u> warning and of the <u>Miranda</u> waiver.'" <u>Id.</u> (quoting <u>Seibert</u>, 542 U.S. at 622). When theorizing what could qualify as

a curative measure, the Supreme Court posited that it could mean "a substantial break in time and circumstances between the prewarning statement and the <u>Miranda</u> warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." <u>Seibert</u>, 542 U.S. at 622.

Here, based on the Court's review of the video and audio recording of Defendant's interrogation in the FBI's Philadelphia field office, Agents 1 and 2 appear to have deliberately delayed giving Defendant the <u>Miranda</u> warnings.  Before Defendant is finally given the <u>Miranda</u> warnings thirty-three (33) minutes into the interrogation video, Agent 1 had been in almost continuous conversation with Defendant and even told Defendant several times that he would eventually be informed of his rights.  For example, at the beginning of the video, Agent 1 decides to walk Defendant through the upcoming interrogation process, saying:

> Let's do the process. [C]ause what we're gonna do is [Agent 2] and I are going to, we're gonna explain everything on your charges . . . we're gonna explain like how things are gonna work. You already know before we do any of that, we gotta talk to you. <u>We gotta, we gotta start with your rights. That's the first step. And I just need to wait for my partner to get down here.</u> So we can start that. And then we're gonna go through this. I'm gonna tell you this right now before we start that. The best way to help yourself, just be straight up. If you don't want to tell me something, you wanna tell [Agent 2] something, just say that. Okay? But I need to hear, I want to hear your side of the story. <u>I can't hear that until we kind of do this the right way.</u> Okay?

(Doc. No. 47-2 at 4:1-10 (emphasis added).)  Several minutes later, after more conversation with Defendant, Agent 1 tells Defendant "[l]isten, I, I gotta, I can't talk to you until I do this the right way."  (<u>Id.</u> at 5:1.)  And later, after even more conversation, Agent 1 says again "I, I'd prefer we talk about this after I read you your rights. I mean, if you want to keep asking questions, I can't like you can."  (<u>Id.</u> at 7:25-26.)

While Agent 1 did explain to Defendant that he was waiting on Agent 2 to arrive to read Defendant his <u>Miranda</u> rights, he did not explain why it was Agent 2 who had to read Defendant

his rights.  Moreover, the Government has not explained the reason for the delay in its Response in Opposition to the instant Motion to Suppress nor at the Court's March 13, 2025 hearing on the Motion.  (See Doc. No. 28.)  And the Court cannot conceive of a reason why such a delay was necessary.  Certainly Agent 1 was capable of giving Defendant the Miranda warnings himself.  If he wanted to conduct the interrogation of Defendant "the right way," as he claimed, Defendant should have been given the Miranda warnings upon entering the interrogation room, if not earlier.  Without explanation as to why Defendant could not be given the Miranda warnings for the first time until Agent 2 appeared with the paperwork thirty-three minutes into the interrogation video, the only conclusion is that the delay in reading Defendant his rights was a deliberate interrogation tactic.

Moreover, no curative measures were taken by the Agents before Defendant made post-warning statements.  There was no break in time and circumstances between Defendant's pre-Miranda statement and the Miranda warning.  For example, Defendant remained in the FBI interrogation room for the entire hour of the video and, for almost the entire hour, Defendant sat there conversing with Agent 1.  After Defendant is given the Miranda warnings approximately thirty-three (33) minutes into the video, he and Agent 1 largely continue conversing as they had been before he received the Miranda warnings.  There was also no additional warning given by either Agent 1 or Agent 2 to Defendant that his pre-Miranda statements would be inadmissible. In fact, as defense counsel points out, the record is silent as to whether Defendant knew he was being video or audio recorded while in the interrogation room.  (Doc. No. 47 at 5.)  While these factors are only two examples of potential curative measures, the transcript does not reveal that Agents 1 and 2 took any alternative measures.

Finally, Defendant's post-<u>Miranda</u> statements were related to the substance of his pre-<u>Miranda</u> statements.  In his pre-<u>Miranda</u> statements, Defendant discussed the charges pending against him with Agent 1.  And in his post-<u>Miranda</u> statements, Defendant continues to discuss these charges with Agent 1.  Accordingly, because Defendant was subject to the "question first, warn later" tactic prohibited by the Supreme Court in <u>Seibert</u>, his post-<u>Miranda</u> statements will be suppressed as well.  <u>See</u> <u>Naranjo</u>, 426 F.3d at 232 ("If the deliberate two-step strategy has been used, post[-]warning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the post[-]warning statement is made.") (quoting <u>Seibert</u>, 542 U.S. at 622).  But, as above, these statements may be used by the Government for impeachment purposes on the cross-examination of Defendant should he testify at trial.  <u>See</u> <u>Elstad</u>, 470 U.S. at 306-07.

## C.    Defendant's Booking Statements Will Be Suppressed In Part

Finally, certain post-<u>Miranda</u> statements that Defendant made in response to routine booking questions will be suppressed while other booking statements he made will not be suppressed.  The Supreme Court has recognized an exception to <u>Miranda</u> for "routine" questions designed to elicit "biographical data necessary to complete booking or pretrial services." <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990); <u>see also</u> <u>United States v. Bishop</u>, 66 F.3d 569, 572 n.2 (3d Cir. 1995) (recognizing that "there is a 'routine booking exception' to the requirements of <u>Miranda v. Arizona</u>").  This exception, referred to as the "booking exception," applies to questions asked by law enforcement officers "for record-keeping purposes only."  <u>Id.</u>

However, if the booking questions are designed to elicit an incriminating response, the booking exception does not apply.  <u>See</u> <u>United States v. Graham</u>, No. 23-3197, 2025 WL 342190, at *3 (3d Cir. Jan. 30, 2025).  For example, otherwise routine booking questions have been found by courts as designed to elicit an incriminating response when the questioning officer is involved

in the underlying investigation and should know that the requested information could be incriminating.  See Mateo, 392 F. Supp. 3d at 468 (holding that the booking exception did not apply to a question asking for the defendant's cellphone number because the requesting officers were already aware of the defendant's number and knew the defendant's answer could be incriminating); United States v. Sanchez, 334 F. Supp. 3d 1284, 1301 (N.D. Ga. 2018) (holding that the booking exception applied to a question asking for the defendant's nicknames because the questioning officer was not involved in the underlying investigation and did not understand the significance of the defendant's nickname to that investigation).

Here, Defendant's responses to Agent 2's questions about his aliases and mother's phone number will be suppressed, while his responses concerning his social security number, middle initial, parents' birth country, whether he was recently in a jail or medical facility, and emergency contact information will not be suppressed.  Regarding the booking statements that will be suppressed, Agent 2, the agent who asked Defendant the booking questions, was one of the main FBI agents investigating Defendant's case and, as such, was already aware of Defendant's aliases and phone number.  For example, in response to Agent 2's questions about his aliases and his mother's phone number, Defendant gives the following answers:

Agent 2: Alright. You got any aliases?

Tharrington: They on the paper. Black and roadblock.

***

Agent 2: What's [your mother's] phone number?

Tharrington: 215.

Agent 2: Yep.

Agent 1: No, your mom.

<u>Tharrington</u>: Yeah. 897.

<u>Agent 1</u>: No.

<u>Tharrington</u>: 2116. Oh 267.

<u>Agent 1</u>: 267.

<u>Tharrington</u>: 897. I'm sorry, my bad.

<u>Agent 2</u>: You're good.

<u>Tharrington</u>: 267-897-2116.

(<u>Id.</u> at 24-26.)

But the Indictment against Defendant, filed on August 28, 2024, which was almost an entire month before the FBI's interrogation of Defendant occurred, identified Defendant as "Walter Tharrington a/k/a 'Black' a/k/a 'Roaadblock [sic].'" (<u>See</u> Doc. No. 1 at 1.) Moreover, as identified in the affidavit of probable cause for the search warrant of Defendant's residence obtained by the FBI on February 7, 2024, the FBI had received internet provider ("IP") records from Verizon for a certain IP address and learned that the subscriber for the IP address was Defendant's mother. (<u>See</u> Doc. No. 27-2 at 20.) In addition to identifying Defendant's mother as the subscriber to that specific IP address, the Verizon records also listed her telephone number as 267-897-2116. (<u>See</u> <u>id.</u>) As such, through the information reflected in the Indictment and affidavit of probable cause for the February 7, 2024 search warrant, it is clear that the FBI was already aware of Defendant's aliases and his mother's phone number when Agent 2 asked Defendant this information on September 26, 2024.

In addition, as one of the primary FBI agents investigating Defendant's case, Agent 2 knew that Defendant's answers to these questions would be incriminating. For example, through his experience as an FBI agent, Agent 2 likely knew that aliases are commonly used by persons

engaged in the sex trafficking of minors.  With this knowledge, he would have known that asking Defendant to list his aliases would elicit an incriminating response from Defendant.  So he should have known that asking Defendant for his phone number also would result in an incriminating response.  Thus, because Agent 2's questions about Defendant's aliases and his mother's phone number were designed to elicit an incriminating response from Defendant, they do not fall under the booking exception and will be suppressed.  However, like the above statements, these statements may be used by the Government for impeachment purposes on the cross-examination of Defendant should he testify at trial.  See Elstad, 470 U.S. at 306-07.

Finally, regarding the booking statements that will not be suppressed, this information is the type of "biographical data necessary to complete booking or pretrial services" that falls within the booking exception.  See Muniz, 496 U.S. at 601.  These statements cover Defendant's social security number, middle initial, parents' birth country, whether he was recently in a jail or medical facility, and emergency contact information and were not designed to elicit an incriminating response.  As such, these statements will not be suppressed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Custodial Statements (Doc. No. 25) will be granted in part and denied in part.  An appropriate Order follows.